**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

U.S. COMMODITY FUTURES
TRADING COMMISSION,

       Plaintiff,

                           Case No. 3:15-cv-5-J-34MCR

v.

ALLIED MARKETS LLC,
JOSHUA GILLILAND, and
CHAWALIT WONGKHIAO,

       Defendants.

_____/

# O R D E R

This action is brought by the United States Commodity Futures Trading Commission (CFTC), pursuant to its authority under section 6 of the Commodity Exchange Act (CEA), 7 U.S.C. § 13a-1 (2012), against Defendants Allied Markets LLC (Allied), Joshua Gilliland (Gilliland), and Chawalit Wongkhiao (Wongkhiao). CFTC alleges that the Defendants violated the CEA, 7 U.S.C. §§ 1, *et seq.*, along with several regulations codified in the Code of Federal Regulations (CFR), 17 C.F.R. §§ 1, et seq. (2012), in connection with the operation of an illegal commodity pool trading in foreign currency exchange options, otherwise known as "Forex."[1] See generally Complaint for Injunctive Relief, Civil Monetary Penalty, and Other Equitable Relief (Doc. 3; Complaint), filed on January 12, 2015. At the beginning of these proceedings, on CFTC's motion, the Court entered an ex parte statutory restraining order. See Order Granting Plaintiff's Ex Parte Motion for Statutory Restraining

---

[1] "Foreign-exchange options allow investors to speculate on the future prices of major currencies such as the pound, yen, euro, and dollar." United States v. Odoni, 782 F.3d 1226, 1230 (11th Cir. 2015).

Order and Scheduling Preliminary Injunction Hearing (Doc. 9; Statutory Restraining Order). Thereafter, with the consent of all Defendants, the Court entered a preliminary injunction and asset freeze which remains in place today. See Order (Doc. 18), entered January 20, 2015.

The matter is currently before the Court on CFTC's Motion for Summary Judgment against Defendants Joshua Gilliland and Chawalit Wongkhiao (Doc. 53; Motion), filed on October 2, 2015.[2] Although given adequate time to do so, neither Defendant Gilliland nor Wongkhiao (hereinafter, Defendants) responded to the Motion. As such, on November 10, 2015, this Court entered an Order directing Defendants to file a response to the Motion by December 4, 2015, and advised Defendants that if they failed to respond, the Court would treat the Motion as being unopposed. See Order (Doc. 58), signed on November 9, 2015. As of this date, neither Defendant has filed a response to the Motion. Accordingly, the Motion is ripe for review.

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those

---

[2] On July 21, 2015, the Court directed the Clerk of the Court to enter a default as to Defendant Allied, see Order (Doc. 50), and the Clerk did so on July 22, 2015, see Clerk's Default (Doc. 51). Thereafter, CFTC moved for entry of default judgment against Allied. See Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalty, and Equitable Relief against Defendant Allied Markets LLC (Doc. 52), filed on September 14, 2015. But the Magistrate Judge denied that motion as prematurely filed given that the claims against Defendants Gilliland and Wongkhiao had yet to be resolved, and thus there was a risk of inconsistent adjudications. See Order (Doc. 55) (citing Frow v. De La Vega, 82 U.S. 552 (1872)).

made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[3] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the Court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit

---

[3] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II. Background[4]

Defendants were the managing and sole members of Allied, a limited liability company that Defendants operated from at least February of 2012 until December of 2014. <u>See</u> Deposition of Allied Markets, LLC, through Joshua Gilliland, and Joshua Gilliland, Individually, Taken on behalf of the Plaintiff (Doc. 53-1; Deposition), dated January 16, 2015, at 29–30; Factual Basis of Wongkhiao Plea Agreement (Doc. 53-6; Wongkhiao Plea), dated August 21, 2015, at 17; Factual Basis of Gilliland Plea Agreement (Doc. 53-7; Gilliland Plea), dated September 10, 2015, at 16; <u>see</u> <u>also</u> Complaint ¶ 9; Answer of Defendant Joshua Gilliland (Doc. 19; Gilliland Answer), dated January 22, 2015, ¶ 9; Answer of Defendant Chawalit Wongkhiao (Doc. 20; Wongkhiao Answer), dated January 23, 2015, ¶ 9.[5] Defendants formed Allied for the purpose of trading Forex, and operated

---

[4] Because this case is before the Court on a motion for summary judgment, when addressing the merits of the Motion, the Court will view the facts presented in the light most favorable to Defendants. <u>See</u> <u>T-Mobile South LLC v. City of Jacksonville, Fla.</u>, 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008). As such, the facts recited in this section are either undisputed, or any disagreement has been indicated.

[5] Allied may have begun operating as early as January 2011. This possible discrepancy is of no consequence. <u>See</u> Deposition at 82 (discussing the total amount that Allied lost trading Forex "from the time period of January 2011 to December 24, 2014"); Plaintiff's First Set of Requests for Admission and Interrogatories to Defendant Joshua Gilliland (Doc. 53-2; Gilliland RFAs), dated April 20, 2015, at 27 (same); Plaintiff's First Set of Requests for Admission and Interrogatories to Defendant Chawalit Wongkhiao (Doc. 53-3; Wongkhiao RFAs), dated April 20, 2015, at 29 (same); Plaintiff's First Set of Requests for Admission and Interrogatories to Defendant Allied Markets LLC (Doc. 53-4; Allied RFAs), dated April 20, 2015, at 54 (same).

the company mainly out of Jacksonville, Florida.  See Deposition at 16, 34–36; Wongkhiao Plea at 17; Gilliland Plea at 16.  Allied would solicit money from potential customers, who would provide such funds to the company for the purpose of trading in Forex.[6]  See Deposition at 17.  During the period of its operation, funds invested by customers constituted Allied's sole source of revenue.  See id. at 19–20, 24.[7]  Indeed, Allied never made a profit trading Forex.  See Deposition at 81-82; Gilliland RFAs at 28; Wongkhiao RFAs at 29; Allied RFAs at 54; Wongkhiao Plea at 24; Gilliland Plea at 23.  Allied marketed Forex investments to clients by guaranteeing them a certain rate of return, or interest, regardless of whether the trading resulted in a profit or loss to Allied.  See id. at 25–27, 85–87, 96–97; see also Gilliland RFAs at 11, 16; Wongkhiao RFAs at 12, 17; Allied RFAs at 44, 48.  Critically, Allied was never registered with CFTC or any federal or state agency as a foreign exchange dealer or commodity pool operator, and neither Gilliland nor Wongkhiao ever registered with CFTC, or any federal or state agency, as associated persons of such an entity.  See Deposition at 40; Gilliland RFAs at 5, 7; Wongkhiao RFAs at 5, 7; Allied RFAs at 39, 41; Gilliland Answer ¶¶ 9–11, 74; Wongkhiao Answer ¶¶ 9–11, 74.

Gilliland and Wongkhiao acted as managing members of Allied and "jointly controlled" the business, with Gilliland serving as its registered agent.  See Gilliland Plea at 16; Wongkhiao Plea at 17; see also Deposition at 30, 38–39; Gilliland RFAs at 6–7;

---

[6] According to Gilliland, the funds given to Allied by its customers were also meant to be used for "business expenses."  Deposition at 17, 90–91.  However, Gilliland admits that he never informed customers that their funds would be used to pay Allied's business expenses, and he did not know if anyone informed them of such.  See id. at 25.

[7] Although Gilliland stated in the Deposition that Allied maintained another source of revenue through a loan made to two individuals, Gilliland was unsure if Allied charged those individuals interest, and one individual failed to repay the loan.  See Deposition at 19–23.  No evidence was presented to the Court that Allied actually made any revenue from these loans.

Wongkhio RFAs at 6–7; Allied RFAs at 40. Wongkhiao solicited customers to invest their money with Allied and conducted the majority of the Forex trades. See Deposition at 37–38, 70-71, 83, 91; see generally Wongkhiao Plea (Wongkhiao conducted various trades with investors). Wongkhiao also executed checks and agreements with investors on behalf of Allied. See Deposition at 84, 96; Wongkhiao RFAs at 11–13, 17, 21; Allied RFAs at 44, 45, 47, 49, 50. Gilliland's role in the company was to manage the information technology required to facilitate trading—he set up the servers and computers and created Excel spreadsheets and Microsoft Office documents for use during trading. See id. at 32-33. On occasion, though not very often, Gilliland himself conducted trades. See id. at 32, 70–72; see also Gilliland RFAs at 28. In his deposition, Gilliland stated that he never solicited customers to invest in Allied. See Deposition at 132-34; see also id. at 83, 91. However, CFTC served Gilliland with the Gilliland RFAs, to which Gilliland failed to respond, despite having been served with them on two occasions. See generally Gilliland RFAs; Allied RFAs. In the Gilliland RFAs, CFTC requested that Gilliland admit that he solicited customers to provide funds to Allied. See Gilliland RFAs at 10, 15, 18, 22, 30. Pursuant to Rule 36, "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Rule 36(a)(3). Gilliland did not respond to or otherwise deny the requested admissions, therefore, the facts in the relevant request are deemed admitted. See Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264 (11th Cir. 2003) (citing United States v. 2204 Barbara Lane, 960 F.2d 126, 129-30 (11th Cir. 1992)). Where, as here, Gilliland's deposition and his admissions conflict, Gilliland's admissions control. See James Wm. Moore, 7 Moore's Federal Practice §

36.03, at 36-15; see also Sook Kim v. Goldstein, No. 04 Civ. 3755(KMW), 2007 WL 1649902, at *2 (S.D.N.Y. June 6, 2007) (noting that "[t]o the extent that Plaintiffs' admissions conflict with deposition testimony, the former are controlling.").

Wongkhiao and Gilliland set up several bank accounts with Citibank[8] in Allied's name—two checking accounts and one money market account. See Deposition at 41. Only Wongkhiao and Gilliland were authorized to access the Allied accounts. See id. at 49–50. The purpose of the Citibank accounts was to facilitate and hold funds for Forex trading, see id. at 43, and the accounts were funded entirely from investments from customers, see id. at 43–44. Nevertheless, Allied also used the accounts to pay both its business expenses and the personal expenses of Gilliland and Wongkhiao. See id. at 49, 56, 76–79; see also Gilliland RFAs at 29-30; Wongkhiao RFAs at 27, 30-31; Allied RFAs at 55; Wongkhiao Plea at 18; Gilliland Plea at 17. Indeed, both Wongkhiao and Gilliland possessed debit cards linked to one of Allied's Citibank accounts that both used to pay their personal expenses, such as a gym membership and luxury car rental fees. See Deposition at 49, 56-57. Additionally, on occasion, Gilliland and Wongkhiao would write checks or transfer money from an Allied account to their personal accounts. See id. at 54–60, 63–64, 67–68.

Between 2012 and December 2014, Allied accepted funds from at least five individual investors: $1,150,000 from Cindy Maxwell (Maxwell), $100,000 from Kim Stanley (Stanley), $100,000 from Daniel Slowinski (Slowinski), $80,000 from Stevon Webster (Webster), and $130,000 from Lauren O'Bryan (O'Bryan). See Deposition at 83–84, 86,

---

[8] Citibank "is a federally insured financial institution whose activities affect interstate commerce." Wongkhiao Plea at 17; see also Gilliland Plea at 16.

88-89, 91, 95–98, 100; Gilliland RFAs at 24–25; Wongkhiao RFAs at 26. Allied deposited approximately $1,161,000 of the $1,560,000 it received from customers, into its Forex trading account, but over time withdrew approximately $886,000 from that account to pay its business expenses and the personal expenses of Gilliland and Wongkhiao. See Deposition at 78–79.

In the course of its operations, Allied executed written investor agreements with certain investors including Maxwell and Stanley. See id. at 85-86, 88, 95–97. In the investor agreements, Allied guaranteed the investors a return on their investments—specifically, Allied promised Maxwell that she would receive ten percent annually, and promised Stanley that she would receive seven percent annually. See id. at 86–87, 96.[9] Neither Allied, Gilliland, or Wongkhiao ever communicated to the investors that the net result of Allied's Forex trading was actually a loss. Gilliland RFAs at 28; Wongkhiao RFAs at 29–30. In fact, over its lifetime, Allied sustained a net loss of $190,878.88. See Deposition at 83; Gilliland RFAs at 28; Wongkhiao RFAs at 29; Allied RFAs at 54; see also Wongkhiao Plea at 24; Gilliland Plea at 23. Despite this, Defendants communicated to their investors that Allied was trading Forex at a profit. See Gilliland RFAs at 11, 16, 18, 22; Wongkhiao RFAs at 11, 16, 19, 23; see also Wongkhiao Plea at 19-21; Gilliland Plea at 18-20.

Although in the Deposition, Gilliland often referred to the funds received from customers as "loans," Allied portrayed the funds as "investments" to its customers. See Deposition at 85-87. Notably, neither Allied, nor Gilliland or Wongkhiao, ever informed the

---

[9] At the deposition, Gilliland could not recall the percentage rate guaranteed to investors Slowinski or Webster, but stated that "[t]here should be a return." See Deposition at 98–99; see also id. at 100–01. Gilliland also could not recall any details regarding O'Bryan's investments. See id. at 101–02.

customers that their funds were to be used for anything other than Forex trading; no customer ever agreed to allow Allied, Gilliland, or Wongkhiao to use those funds for other purposes. See Deposition at 24–27, 77, 87-90; Gilliland RFAs at 29; Wongkhiao RFAs at 30; Wongkhiao Plea at 18, 21; Gilliland Plea at 17, 20.

Allied did make several returns to the investors over its lifetime. From November of 2012 through May of 2013, Allied remitted seven payments to Maxwell, each for $4,167, totaling $29,169, and represented to Maxwell that the payments constituted returns derived from its Forex trading. See Deposition at 87; Gilliland Plea at 20; Wongkhiao Plea at 21; Gilliland RFAs at 12–13; Wongkhiao RFAs at 13–14; Allied RFAs at 45. On request from Stanley, Allied returned the full amount of her investment. See Deposition at 96, 134–35. Allied also returned Slowinski's and Webster's investments in full. See id. at 99–100. In addition to their investments, Allied paid Slowinski and Webster $15,000, and $4,000, respectively, that Allied represented as being profits from Forex trading. See Gilliland RFAs at 20–21, 24; Wongkhiao RFAs at 21–22, 25. Defendants also remitted $15,800 to O'Bryan. See Declaration of Patricia Gomersall (Doc. 52-1; Gomersall Decl.) ¶ 18. Ultimately, Defendants fraudulent scheme resulted in a loss to at least two customers in the amount of $1,235,031. See id.

On March 18, 2015, in the United States District Court for the Middle District of Florida, the United States indicted Defendants Gilliland and Wongkhiao on charges of conspiracy to commit wire fraud and conspiracy to commit money laundering, based in part on the conduct alleged in the CFTC's Complaint. See Indictment, United States v. Gilliland,

et al., No. 3:15-cr-35-J-34PDB (M.D. Fla. Mar. 18, 2015),[10] Doc. 1. Both Gilliland and Wongkhiao ultimately entered pleas of guilty to the charge in Count One of the Indictment pursuant to plea agreements. See United States v. Gilliland, Doc. Nos. 55-58, 62-65; Wongkhiao Plea; Gilliland Plea.

## III. Discussion

## A. Violations of Section 4b of the CEA

CFTC alleges that Defendants committed fraud, in violation of Section 4b of the CEA, 7 U.S.C. § 6b, along with its parallel regulation, by making material misrepresentations and omissions to potential investors and by misappropriating investor funds. See Motion at 11–16; see also 7 U.S.C. § 6b(a)(2)(A), (C) (prohibiting "any person, in or in connection with . . . any contract of sale of any commodity for future delivery[11] . . . that is made . . . with[] any other person," from "cheat[ing] or defraud[ing] or attempt[ing] to cheat or defraud the other person," or "willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract . . . or in regard to any act of agency performed"); 17 C.F.R. § 5.2(b) (same, with respect to "retail forex transaction[s]"). To establish that Defendants committed fraud in violation of the CEA, CFTC must prove: (1) that Defendants made a misrepresentation, misleading statement, or deceptive omission; (2) with scienter; and (3) the misrepresentation, misleading statement, or omission was material. See CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d

---

[10] Although CFTC has filed only certain documents from the related criminal case, the Court takes judicial notice of the criminal case against Defendants and may do so sua sponte pursuant to Rule 201, Federal Rules of Evidence (FRE). FRE 201(c)(1).

[11] This Section applies with equal force to Forex transactions. See 7 U.S.C. § 2(c)(2)(C)(i)–(ii)(I) (stating that Forex transactions with persons that are not eligible contract participants "shall be subject to . . . sections . . . 6b, . . . 6o, . . . and 13b of this title"); see also 7 U.S.C. § 1a(18) (defining "eligible contract participant"). None of Allied's customers are considered eligible contract participants as defined therein.

1321, 1328 (11th Cir. 2002)[12]; CFTC v. Premium Income Corp., No. 3:05-CV-0416-B, 2007 WL 4563469, at *4 (N.D. Tex. Dec. 28, 2007).

"Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." Fitzgerald, 310 F.3d at 1328 (quotations omitted). CFTC introduced evidence of numerous misrepresentations made by Defendants to their customers and potential customers. Defendants tricked potential customers into thinking that Forex trading was a safe investment, going so far as to guarantee customers certain percentage returns in order to capture their funds. Defendants also told customers that they were experienced in Forex trading and had conducted exhaustive research into trading strategies. In fact, Defendant Wongkhiao showed at least one investor falsified documents that purported to show that Allied had experienced "significant daily and monthly profits from forex trading." Wongkhiao Plea at 20; Gilliland Plea at 19. Finally, Defendants paid out funds to certain customers, and told those customers that the funds were profits from trading, when in reality, the funds were paid using new investments from customers in the manner of a Ponzi scheme.[13]

Defendants also deceptively omitted certain information in soliciting their customers. Defendants never informed any customer that the funds they were investing were being

---

[12] "Unlike a cause of action for fraud under the common law of Torts, 'reliance' on the representations is not a requisite element in an enforcement action." Fitzgerald, 310 F.3d at 1328 n. 6 (citing CFTC v. Rosenberg, 85 F. Supp. 2d 424, 446 (D.N.J. 2000)). Nevertheless, the Eleventh Circuit has not determined whether the Court must find reliance to award restitution in enforcement proceedings. See CFTC v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1345 n.3; but see Fitzgerald, 310 F.3d at 1343 n. 5 (Wilson, J., dissenting). For the reasons set forth in Section III.F.b. below, the Court need not resolve the issue in this case.

[13] The Eleventh Circuit has explained, "[t]he essence of a Ponzi Scheme is to use newly invested money to pay off old investors and convince them that they are earning profits rather than losing their shirts." Perkins v. Haines, 661 F.3d 623, 625 n.1 (11th Cir. 2011). As Allied had no revenue but for trading, and Allied's trading did not result in net profits, the only source of the funds used to pay investors as "profits" must have been from new investments.

used to pay Allied's business expenses or the often lavish personal expenses of Defendants, including gym memberships and luxury car rentals, or that in fact, Defendants traded very little of the investments entrusted to Allied—depositing only $1,160,000 of the $1,560,000 invested with Allied, and withdrawing the majority of these funds to pay other expenses. Defendants also never informed their customers that Allied was consistently losing money trading. Finally, Defendants never informed their customers that neither Allied nor either of the Defendants was registered with CFTC.

Moreover, Defendants' use of invested funds to pay Allied's and Defendants' expenses, as well as to pay "returns" to other customers, when the invested funds were meant to be used only for trading, constitutes misappropriation. Misappropriating funds in this way "constitutes willful and blatant fraudulent activity" that violates the anti-fraud provisions of the CEA. See CFTC v. Noble Wealth Data Info. Servs., Inc., 90 F. Supp. 2d 676, 687 (D.Md. 2000) (quotation omitted), aff'd in part, vacated on other grounds in part sub nom., CFTC v. Baragosh, 278 F.3d 319 (4th Cir. 2002), cert. denied, 537 U.S. 950 (2002); see also CFTC ex rel. Kelley v. Skorupskas, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (finding that "misappropriation of customers' funds which had been entrusted to [the defendant] for trading purposes is a violation of both §§ 4b(A) and 4$o$(1)").

Defendants committed these misrepresentations, omissions, and misappropriations with scienter. "[S]cienter is established if Defendant[s] intended to defraud, manipulate, deceive, or if Defendant[]s['] conduct represents an extreme departure from the standards of ordinary care." Fitzgerald, 310 F.3d at 1328 (citation omitted); see also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) ("A showing of severe recklessness satisfies the scienter requirement. . . . Severe recklessness is limited to those

highly unreasonable omissions or misrepresentations . . . that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.") (quotations and citations omitted). It is undisputed that Defendants knew that they were not trading the majority of the funds invested with them, but rather using customer funds to pay for Allied's business expenses and Defendants' personal expenses. Defendants unquestionably knew when they represented to potential customers that they had experience successfully trading in Forex that such was not true. Moreover, any individual trading in Forex, or any other commodity, really, should know that a certain rate of return cannot be guaranteed—markets are often volatile and Defendants must have known that they could do nothing to influence or change those markets, nor could they see into the future to be certain they made profitable trades. See Fitzgerald, 310 F.3d at 1330 (finding scienter when a defendant "deviated in an extreme manner from the standards of ordinary care" by, among other things, "substantially inflating option profit expectations while downplaying risk of loss"). Defendants also admittedly knew that Allied had not made a profit trading Forex, and they knew when they remitted funds to customers over their principal investments and told the customers that those funds were trading profits, that such representations were false. Finally, Defendants knew all along that neither they, nor Allied, was registered with the CFTC; and yet, they failed to inform their customers of such facts. No reasonable jury could find that Defendants acted without scienter in these matters.

Finally, CFTC must show that the misrepresentations and omissions were material. "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." Fitzgerald, 310 F.3d at 1328–29.

Defendants' misrepresentations to customers that their funds would be used for trading Forex, or their failure to inform customers that their funds were used to pay Allied's business expenses and Defendants' personal expenses, are material—the use of such funds was the heart of the agreement between Defendants and their customers.  See Skorupsas, 605 F. Supp. at 932; Rosenberg, 85 F. Supp. 2d. at 447–48; CFTC v. Driver, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012).  Defendants' misrepresentations and omissions regarding the potential for profit and the results of Allied's trading are similarly material.  "It is too obvious for debate that a reasonable listener's choice-making process would be substantially affected by emphatic statements on profit potential."  Fitzgerald, 310 F.3d at 1330; see also Noble Wealth, 90 F. Supp. 2d at 686 ("Indeed, misrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law.").  Additionally, misrepresentations and omissions regarding trading experience and registration status are material—"past success and experience are material factors which a reasonable investor would consider when deciding to invest in commodity options through that firm or broker. . . . Failure to inform customers of these material facts while projecting large profits amounts to fraud."  CFTC v. Commonwealth Fin. Grp., Inc., 874 F. Supp. 1345, 1353–54 (S.D. Fla. 1994) (citations omitted).  Thus, as Defendants made numerous material misrepresentations and omissions and misappropriated investor funds, acting with scienter, summary judgment is due to be entered against Defendants on Count One.

## B.  Violations of Section 4*o* of the CEA

CFTC argues that the same conduct that forms the basis of the Section 4b violations also violates Section 4*o* of the CEA and a corresponding regulation.  See Motion at 15–16;

7 U.S.C. § 6*o*(1)(A),(B) (prohibiting any "commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly," "to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant," or "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant"); 17 C.F.R. § 4.41(a) (prohibiting advertising that "[e]mploys any device, scheme, or artifice to defraud" or that "[i]nvolves any transaction, practice or course of business which operates as a fraud or deceit" on any participant or prospective participant). "The requirements for a fraud claim under § 4*o* are basically the same as for a fraud claim under § 4b [of the CEA]. The elements are derived from the common law action for fraud." First Nat'l Monetary Corp. v. Weinberger, 819 F.2d 1334, 1340 (6th Cir. 1987).[14, 15]

A commodity pool operator (CPO) is any person "engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds . . . for the purpose of trading in" commodities, including Forex. See 7 U.S.C. §§ 1a(11)(i),

---

[14] In the Weinberger case, where the plaintiff, an individual, was the victim of fraud, the Eighth Circuit stated that to prove fraud under the CEA a defendant must intend to induce reliance and the victim must reasonably rely on the misrepresentation. Weinberger, 819 F.2d at 1340. However, the Eleventh Circuit has unequivocally held that in enforcement actions, where CFTC is the plaintiff, reliance is not an element of fraud under the CEA. See Fitzgerald, 310 F.3d at 1328 n. 6 (citing Rosenberg, 85 F. Supp. 2d at 446); see also JCC Inc. v. U.S. Commodity Futures Trading Commission, 63 F.3d 1557, 1565 n.23 (11th Cir. 1995).

[15] The Court recognizes that 7 U.S.C. § 6*o*(1)(B) and the corresponding 17 C.F.R. § 4.41(a)(2) do not require proof of scienter. Messer v. E.F. Hutton & Co., 847 F.2d 673, 677 (11th Cir. 1988); CTFC v. Heffernan, 245 F. Supp. 2d 1276, 1291–92 (S.D. Ga. 2003). However, as Defendants' numerous fraudulent misrepresentations, omissions, and misappropriations violate several subparts of Section 6 of the CEA and their corresponding regulations, and the Court finds that scienter exists as to every violation, the Court need not analyze Section 4*o* and its corresponding regulation separately. See, e.g., Skorupskas, 605 F. Supp. at 932–33, n.19 (collecting cases).

1a(11)(i)(II); 17 C.F.R. 5.1(d)(1); <u>see</u> <u>also</u> 7 U.S.C. §§ 2(c)(2)(C)(i)(aa)–(bb), 2(c)(2)(C)(iv). An associated person (AP) is "any natural person associated with a commodity pool operator . . . as a partner, officer, or employee . . . in any capacity which involves . . . [t]he solicitation or acceptance of retail forex customers' orders . . . or . . . [t]he supervision of any person or persons so engaged." 17 C.F.R. § 5.1(d)(2). Allied acted as a CPO by soliciting, accepting, and receiving from its customers funds which were to be used to trade Forex, and Defendants, the founders and sole managing members of Allied, who admitted to soliciting and accepting such funds, acted as APs. Defendants' fraudulent conduct that violated Section 4b of the CEA, as discussed above, also violates Section 4<i>o</i>. <u>See</u> <u>Skorupskas</u>, 605 F. Supp. at 932; <u>CFTC v. Weinberg</u>, 287 F. Supp. 2d 1100, 1108 (C.D. Cal. 2003); <u>Weinberger</u>, 819 F.2d at 1340. Therefore, summary judgment is due to be entered against Defendants on Count Two.

## C. Failure to Register

CFTC alleges that Defendants violated the CEA by "operat[ing] and solicit[ing] funds for participation in" the Allied CPO while not registered as APs of Allied. <u>See</u> Motion at 16–17; <u>see</u> <u>also</u> Complaint, Count Four. Section 4k(2) of the CEA, 7 U.S.C. § 6k(2), and accompanying regulations, make it unlawful for a person to act as an AP of a CPO, that is, to solicit funds for a commodity pool or supervise persons engaged in such solicitation, without registering with CFTC. <u>See</u> 7 U.S.C. § 6k(2); 17 C.F.R. § 5.3(a)(2)(ii); <u>see</u> <u>also</u> 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc). As previously discussed, Allied qualifies as a CPO and Defendants qualify as APs of Allied for purposes of the CEA. Defendants admit that they never registered with CFTC as APs or in any other capacity. There is no scienter requirement in § 6k(2). <u>See</u> <u>CFTC v. Arrington</u>, 998 F. Supp. 2d 847, 872 (D. Neb. 2014),

aff'd, <u>CFTC v. Kratville</u>, 796 F.3d 873 (8th Cir. 2015).  Thus, Defendants violated 7 U.S.C. § 6k(2) and 17 C.F.R. § 5.3(a), and summary judgment is due to be entered against Defendants on Count Four.

## D. Violations of Regulation 4.20

CFTC argues that Defendants violated several subparts of 17 C.F.R. § 4.20(a)–(c). 17 C.F.R. § 4.20(a) states that "a commodity pool operator must operate its pool as an entity cognizable as a legal entity separate from that of the pool operator."  17 C.F.R. § 4.20(a).  17 C.F.R. § 4.20(b) states that "[a]ll funds . . . received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment . . . on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."  17 C.F.R. § 4.20(b).  Finally, 17 C.F.R. § 4.20(c) states that "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."  17 C.F.R. § 4.20(c).  The evidence demonstrates that Allied violated all three regulations.  Allied did not operate its Forex pool as a legal entity separate from itself—rather, Defendants founded Allied as a limited liability company and under its name opened the Citibank trading account from which it operated the Forex trading pool.  <u>See</u> Deposition at 42–44; <u>see also</u> Wongkhiao Plea at 17; Gilliland Plea at 16.  Allied often received funds directly from its investors in the form of wire transfers or checks to Allied, rather than to the pool. <u>See</u> Deposition at 52; Gilliland RFAs at 7–9, 12–14, 17, 19, 23; Wongkhiao RFAs at 7–9, 12, 14–15, 18, 20, 24; Allied RFAs at 48–49.[16]  Finally, it is undisputed that funds invested

---

[16] On a few occasions, Allied received funds in Wongkhiao or Gilliland's names, rather than in the name of a pool.  <u>See</u> Gilliland RFAs at 24–26, 30; Wongkhiao RFAs at 26–27, 31.

with Allied by customers for the purpose of trading Forex were commingled with Defendants' funds and used to pay Allied's business expenses in addition to Defendants' personal expenses. See Deposition at 47–48 (Gilliland deposited personal funds into the Allied bank account); see also Driver, 877 F. Supp. 2d at 979. However, as all three of these regulations place mandates on a CPO—in this case, Allied—and as CFTC does not seek entry of summary judgment against Allied, the Court must ask whether Defendants can be held liable for Allied's violations of the CEA.

## E. Controlling Person Liability

Pursuant to 7 U.S.C. § 13c(b), "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as the controlled person" if the CFTC proves "that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). As previously discussed, Allied violated Regulation 4.20 by failing to operate the Forex pool as a legally separate entity from itself, receiving funds in names other than a separate pool entity, and commingling pool property with property belonging to other persons.[17] The Court now finds that Defendants are liable for these violations as controlling persons of Allied.

"To establish that a defendant controlled a [business] for purposes of § 13c(b), [CFTC] must show that the defendant 'actually exercised general control over the operation

---

[17] It is possible that Allied also violated the anti-fraud provisions of the CEA and failed to register with CFTC in violation of the CEA; however, as the Motion requests summary judgment only against Defendants, and not against Allied, and because the Court found that Defendants are directly liable for the anti-fraud and registration provisions, the Court need not address whether Defendants should be liable as controlling persons of Allied for those violations.

of the entity principally liable' <u>and</u> 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." <u>Baragosh</u>, 278 F.3d at 330 (emphasis in original) (quoting <u>Monieson v. CFTC</u>, 996 F.2d 852, 859 (7th Cir. 1993)); <u>see</u> <u>also</u> <u>Monieson</u>, 996 F.2d at 860 ("[I]t is [the defendant]'s power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts."). Whether a defendant exercises such general control depends on the facts of the specific case; "an officer or director may not 'control' a [business] for purposes of this section . . . while a non-officer family member may control the [business]." <u>Baragosh</u>, 278 F.3d at 330 (citations omitted). Here, both Defendants possessed the general power to control Allied and the power to control the specific acts that violated the CEA. Defendants were the sole managing members and "jointly controlled Allied" throughout its lifetime. <u>See</u> Gilliland RFAs at 7; Wongkhiao RFAs at 7; Allied RFAs at 40.

Moreover, both Defendants controlled and directly induced the specific activities constituting violations of Regulation 4.20. Defendants jointly set up Allied's business form, and thus, could have exercised that control to create a pool separate from that of the CPO itself. Both Defendants also had sufficient contact with investors such that each Defendant could have directed those investors to send funds to the proper entity. Though Wongkhiao conducted most of the communications with Allied's investors, there is no evidence indicating that Gilliland did not also have the power to do so, and in fact, Gilliland had significant communications with Stanley regarding the return of her investment. <u>See</u> Gilliland Plea at 20–21; Wongkhiao Plea at 21–22. Finally, both Defendants had the power to, and in fact did, control the commingling of funds. Defendants possessed debit cards

linked to Allied's bank accounts and would withdraw funds from Allied's account to pay for personal expenses, sometimes paying those expenses directly from Allied's account, and sometimes depositing the funds into their personal bank accounts. Additionally, there is evidence that on occasion, Wongkhiao deposited funds that were directed to him personally into Allied's account. See Wongkhiao RFAs at 26–27. At the very least, Defendants were deliberately indifferent to the violations that occurred. See CFTC v. Sidoti, 178 F.3d 1132, 1136 (11th Cir. 1999). Thus, Defendants are liable as controlling persons for Allied's violations of 17 C.F.R. 4.20. See Fitzgerald, 310 F.3d at 1334 (finding that the principal of a business who "exercised the ultimate choice-making power . . . regarding its business decisions" and who "reviewed and approved the activities" that violated the Act was a controlling person); Arrington, 998 F. Supp. 2d at 873.

## F. Remedies

### a. Permanent Injunction

7 U.S.C. § 13a-1(b) states that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." 7 U.S.C. §13a-1(b). In determining whether to issue a permanent injunction, "the CFTC is not required to make a specific showing of irreparable injury or inadequacy of other remedies, which private litigants must make." CFTC v. Gutterman, No. 12-21047-CIV, 2012 WL 2413082, at *7 (S.D. Fla. June 26, 2012) (citations omitted). Rather, "the ultimate test is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." Wilshire, 531 F.3d at 1346 (quoting SEC v. Caterinicchia, 613 F.2d 102, 105

(5th Cir. 1980)[18]).  Specifically, the Court should consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations."  Id. (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1322 (11th Cir. 1982)).

Defendants violated core anti-fraud provisions of the CEA, among other violations, with scienter—thus, their conduct was "not the result of mere negligence," and "[t]he state of mind necessary for these violations suggests that [Defendants] may commit future violations."  CFTC v. Heffernan, 274 F. Supp. 2d 1375, 1380 (S.D. Ga. 2003) (citation omitted).  Defendants misappropriated over one million dollars of investor funds, a sum that certainly qualifies as egregious.  See Rosenberg, 85 F. Supp. 2d at 454 (finding misappropriation of "well over $200,000" and using it to pay personal expenses was an egregious violation).  Defendants' violations were not isolated, but rather, took place over at least three years, defrauded at least five individuals, and likely would have continued had they not been investigated both by the CFTC and law enforcement.  See CFTC v. Hall, 49 F. Supp. 3d 444, 453 (M.D. N.C. 2014) (finding violations over a twelve-month period were "systematic" and not isolated).  Given violations of this nature, courts have issued permanent injunctions prohibiting defendants not only from committing future violations of the CEA, but also from trading on behalf of any other person or entity, participating in any commodity-related activity, including soliciting investors.  See Wilshire, 531 F.3d at 1346

---

[18] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

n. 5; <u>Rosenberg</u>, 85 F. Supp. 2d at 454; <u>Noble Wealth</u>, 90 F. Supp. 2d at 692. Thus, the Court finds that a permanent injunction barring Defendants from violating the CEA or participating in any trading or commodity-related activity is warranted.

### b. Restitution

CFTC requests that the Court order Defendants to pay restitution in the amount of $1,235,031. <u>See</u> Motion at 22–23. The Court has authority to award restitution pursuant to 7 U.S.C. § 13a-1(d)(3). However, the Court recognizes that Defendants are already subject to judgment ordering each to pay exactly that amount in restitution as a result of the criminal case against them. <u>See</u> Judgment in a Criminal Case, 3:15-cr-35-J-34PDB (Doc. 85; Gilliland Judgment), entered on February 2, 2016, at 5; Judgment in a Criminal Case, 3:15-cr-35-J-34PDB (Doc. 87; Wongkhiao Judgment), entered February 2, 2016, at 5. The Court finds no need to enter a duplicate judgment, and thus denies CFTC's request that it order restitution in this case. <u>See</u> <u>CFTC v. King</u>, No. 3:06-cv-1583-M, 2007 WL 1321762, at *3 (N.D. Tex. May 7, 2007).

### c. Civil Monetary Penalty

Finally, CFTC requests that the Court impose a monetary penalty against Defendants in the amount of $3,792,600, which it contends represents triple the monetary gain to Defendants from their fraud.[19] <u>See</u> Motion at 23–25. Section 13a-1(d) vests the Court with the authority to impose such a penalty. <u>See</u> 7 U.S.C. § 13a-1(d)(1). In

---

[19] CFTC actually requests a monetary penalty of $3,792,600. <u>See</u> Motion at 25. However, in calculating the monetary gain to Defendants, CFTC made a mathematical error by omitting payments Defendants made to Maxwell in the amount of $29,169. <u>See</u> Deposition at 87; Gilliland RFAs at 12–13; Wongkhiao RFAs at 13–14; Allied RFAs at 45. The true gain to Defendants was not $1,264,200, but rather, $1,235,031, which represents the total amount of principal gained from customers ($1,560,000), less the returns Defendants made to Maxwell (totaling $29,169), Stanley ($100,000), Slowinski ($100,000), Webster ($80,000), and O'Bryan (totaling $15,800). Three times $1,235,031 equals $3,705,093.

determining whether to award a civil penalty pursuant to the CEA, the Court considers the following factors: "the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether or not scienter was involved; the consequences flowing from the violative conduct; financial benefits to a defendant; and harm to customers or the market." Gutterman, 2012 WL 2413082, at *10 (citing Noble Wealth, 90 F. Supp. 2d at 694). "Civil monetary penalties 'should reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations.'" Id. (quoting In re Grossfeld [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467–68 (CFTC Dec. 10, 1996), aff'd, 137 F.3d 1300 (11th Cir. 1998)). The Court recognizes that "[t]o effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct." Id. at 11 (quoting In re GNP Commodities, Inc. [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC Aug. 11, 1992), aff'd sub nom. Monieson, 996 F.2d at 852. This is especially true when, as here, Defendants have committed fraud, a violation of a core provision of the CEA. See Gutterman, 2012 WL 2413082, at *11; Noble Wealth, 90 F. Supp. 2d at 694; CFTC v. Altamont Global Partners, LLC, No. 6:12-cv-1095-Orl-31TBS, 2014 WL 644693, at *11 (M.D. Fla. Feb. 19, 2014).

However, the Court also recognizes that "[a] district court is not obligated to impose the maximum monetary penalty available under the [CEA]." CFTC v. Capital Blu Mgmt., LLC, No. 6:09-cv-508-Orl-28DAB, 2011 WL 2357629, at *7 (M.D. Fla. June 9, 2011). Moreover, the Court is "cognizant of its duty to be realistic and not set a figure which is impossible for a defendant to comply with due to lack of monetary resources." Heffernan, 274 F. Supp. 2d at 1378 (quoting Rosenberg, 85 F. Supp. 2d at 455); see also CFTC v.

<u>Autry</u>, No. 6:10-cv-84, 2011 WL 6400352, at *7 (S.D.Ga. Dec. 19, 2011). In this case, Defendants have already faced severe penalties for their violations. Each Defendant is serving a lengthy prison sentence, in addition to the Court's order of restitution in the amount of $1,235,031, the Court entered an additional forfeiture money judgment in the amount of $1,235,031 against each Defendant, resulting in a total amount of $2,470,062. In light of these penalties, which are already quite severe, and the broad permanent injunction against future trading, the Court finds an additional monetary penalty unnecessary and inappropriate. <u>See</u> <u>SEC v. Credit Bancorp, Ltd.</u>, 738 F. Supp. 2d 376, 391 (S.D.N.Y. 2010). The penalties already imposed in the corresponding criminal case against Defendants, along with the permanent injunction the Court orders today, are sufficient to deter future illegal conduct. Thus, the Court will deny CFTC's request that the Court impose a monetary penalty.

## IV. Conclusion

The Court has found that Defendants violated the anti-fraud provisions and the registration requirements of the CEA and its accompanying regulations, and are liable as controlling persons for Allied's violations of the regulations. Therefore, summary judgment is due to be entered against Defendants on Counts One, Two, Four, and Five of the Complaint. The Court will grant CFTC's request that the Court enter a permanent injunction, but will deny CFTC's request that the Court order restitution or a civil monetary penalty against Defendants.

Remaining before the Court are CFTC's claims against Allied. As noted above, CFTC obtained the entry of a default against Allied, but the Court denied without prejudice a motion for default judgment because the claims against the individual Defendants

remained unresolved. Thus, at this time, CFTC may file a renewed motion for default judgment. Alternatively, if CFTC is satisfied that the judgment ordered to be entered here accomplishes its purposes, it may so advise the Court and dismiss its claims against Allied.

Accordingly, it is **ORDERED:**

1. The Motion for Summary Judgment Against Defendants Joshua Gilliland and Chawalit Wongkhiao (Doc. 53) is **GRANTED in part and DENIED in part**.

2. Defendants Joshua Gilliland and Chawalit Wongkhiao (either individually or doing business through any person or entity), and their representatives, agents, employees, or any other person acting in concert with any of them, are immediately and permanently enjoined from directly or indirectly:

    a. Engaging in conduct that violates 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b, 6k(2), and 6o, and 17 C.F.R. §§ 3.12, 4.20, 4.41, 5.2 and 5.3;

    b.  Trading on or subject to the rules of any registered entity as that term is defined in 7 U.S.C. § 1a;

    c. Engaging in any commodity-related activity, including, but not limited to, transactions involving Forex;

    d. Soliciting, receiving, or accepting any funds from any person for the purpose of commodity-related activity;

    e. Applying for registration or claiming exemption from registration with CFTC in any capacity;

    f. Engaging in any act requiring registration with the CFTC (or an exemption from such registration);

g. Acting as a principal, agent, officer, or any other employee of any person required to be registered with CFTC or expressly exempted from such registration pursuant to 17 C.F.R. § 4.14(a), except such persons provided for in 17 C.F.R. § 4.14(a)(9).

3. The Clerk of Court is directed to enter **JUDGMENT** in favor of Plaintiff U.S. Commodity Futures Trading Commission, and against Defendants Joshua Gilliland and Chawalit Wongkhiao.

4. Plaintiff U.S. Commodity Futures Trading Commission is directed to advise the Court whether it intends to file a motion for default judgment against Defendant Allied Markets LLC or to dismiss that claim in light of the resolution of the claims against the individual Defendants. Plaintiff shall file its notice by **March 29, 2019**.

**DONE AND ORDERED** in Jacksonville, Florida, this 4th day of March, 2019.

**MARCIA MORALES HOWARD**
United States District Judge

lc20/i43

Copies to:

Counsel of Record

Pro Se Parties